**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| SONYA ODUM EMERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:21CV307 |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant.[1] | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Sonya Odum Emerson, brought this action pursuant to Section 205(g) of the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 8 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 11, 14; see also Docket Entry 12 (Plaintiff's Memorandum); Docket Entry 15 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

---

[1] President Joseph R. Biden, Jr., appointed Kilolo Kijakazi as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## I. PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 245-56), alleging a disability onset date of September 19, 2018 (see Tr. 245, 250). Upon denial of that application initially (Tr. 110-25, 147-51) and on reconsideration (Tr. 126-46, 155-63), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 164-65). Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 81-109.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 56-71.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-7, 240-44, 363-68), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2024.
>
> 2. [Plaintiff] has not engaged in substantial gainful activity since September 19, 2018, the alleged onset date.
>
> . . .
>
> 3. [Plaintiff] has the following severe impairments: degenerative disc disease, degenerative joint disease of the bilateral shoulders, chronic obstructive pulmonary disease, asthma, obesity, attention deficit hyperactivity disorder, depressive disorder, [and] anxiety disorder.
>
> . . .
>
> 4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals

2

the severity of one of the listed impairments in 20 CFR
Part 404, Subpart P, Appendix 1.

. . .

5.  . . . [Plaintiff] has the residual functional
capacity to perform light work . . . except lifting 20
pounds occasionally and 10 pounds frequently; sitting for
6 hours, standing for 6[]hours, walking for 6 hours[,
and] push[ing] or pull[ing] as much as [she] can lift or
carry; frequently reaching overhead to the left, and
frequently reaching overhead to the right; climbing ramps
and stairs frequently, never climbing ladders, ropes, or
scaffolds, stoop frequently, kneel frequently, crouch
frequently, crawl frequently; occasional exposure to
dust, odors, fumes and pulmonary irritants. [Plaintiff]
may perform simple, routine and repetitive tasks but not
at a production rate pace, perform simple work-related
decisions, [and] interact with supervisors, coworkers,
and the public frequently.

. . .

6.  [Plaintiff] is unable to perform any past relevant
work.

. . .

10. Considering [Plaintiff]'s age, education, work
experience, and residual functional capacity, there are
jobs that exist in significant numbers in the national
economy that [she] can perform.

. . .

11. [Plaintiff] has not been under a disability, as
defined in the . . . Act, from September 19, 2018,
through the date of this decision.

(Tr. 61-71 (bold font and internal parenthetical citations

omitted).)

Case 1:21-cv-00307-CCE-LPA   Document 16   Filed 04/04/22   Page 3 of 45

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not shown entitlement to relief under the extremely limited review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a

4

verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

5

to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of

---

[2] The Act "comprises two disability benefits programs. [DIB] provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, the "claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, *i.e.*, "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

7

perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

## B. Assignments of Error

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he Functional Capacity Evaluation ('FCE') performed on August 7, 2020 is new and material evidence that necessitates remand for further consideration of the RFC and vocational testimony" (Docket Entry 12 at 5 (bold font and single-spacing omitted)); and

2) "[t]he ALJ's failure to properly evaluate [Plaintiff]'s pain and other symptoms is harmful error that prevented the ALJ from properly account [sic] for their impact on [Plaintiff]'s RFC" (id. at 13 (bold font and single-spacing omitted)).

---

[5] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 15 at 10-22.)

### 1. Evidence Submitted to Appeals Council

Plaintiff's first assignment of error maintains that "[t]he [FCE] performed on August 7, 2020 is new and material evidence that necessitates remand for further consideration of the RFC and vocational testimony." (Docket Entry 12 at 5 (bold font and single-spacing omitted).) More specifically, Plaintiff notes that she submitted the FCE to the Appeals Council (see id. (referencing Tr. 10-12)), but that the Appeals Council "concluded that '[the FCE] d[id] not show a reasonable probability that it would change the outcome of the [ALJ's] decision'" (id. (quoting Tr. 2)). Plaintiff further points out that "the valid conclusions of the FCE revealed a restriction to the sedentary exertional range along with additional postural and manipulative limitations" and "would support the addition of an RFC limitation that would all [sic] her to alternate between sitting and standing frequently throughout the workday." (Id. at 6.) According to Plaintiff, new evidence submitted to the Appeals Council "(1) must be 'relevant to the determination of disability at the time the application was first filed and not merely cumulative' and (2) material to the extent that the [Commissioner]'s decision 'might reasonably have been different' had the new evidence been before her.'" (Id. (quoting Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985)).) Plaintiff

9

additionally concedes that she must make "a showing of 'good cause for [her] failure to submit the evidence when the claim was before the [Commissioner,]'" and that she "'must present to the [ Court] at least a general showing of the nature of the new evidence.'" (Id. (quoting Borders, 777 F.2d at 955) (internal quotation marks omitted).) In Plaintiff's view, "[t]he FCE satisfies all four of the requirements necessary to establish that it is new and material evidence." (Id.)

As an initial matter, Plaintiff's reliance on Borders misses the mark, as that case predated the passage of regulations governing the Appeals Council's consideration of new evidence in 1987. See 20 C.F.R. § 404.970 (providing that, "[i]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the [ALJ's] hearing decision") (version effective from Feb. 9, 1987 until Jan. 16, 2017)). The SSA has since amended that regulation twice, and the latest version, effective December 16, 2020, provides as follows:

(a) The Appeals Council will review a case . . . if—

. . .

(5) Subject to paragraph (b) of this section, the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision.

(b) The Appeals Council will only consider additional evidence under paragraph (a)(5) of [ S]ection [404.970] if [the claimant] show[s] <u>good cause for not informing [the SSA] about or submitting the evidence [no later than five business days before the date of the scheduled ALJ hearing]</u> as described in § 404.935 because:

(1) [The SSA's] action misled [the claimant];

(2) [The claimant] had a physical, mental, educational, or linguistic limitation(s) that prevented [him or her] from informing [the SSA] about or submitting the evidence earlier; or

(3) Some other unusual, unexpected, or unavoidable circumstance beyond [the claimant's] control prevented [him or her] from informing [the SSA] about or submitting the evidence earlier. Examples include, but are not limited to:

(i) [The claimant] w[as] seriously ill, and [his or her] illness prevented [him or her] from contacting [the SSA] in person, in writing, or through a friend, relative, or other person;

(ii) There was a death or serious illness in [the claimant's] immediate family;

(iii) Important records were destroyed or damaged by fire or other accidental cause;

(iv) [The claimant] actively and diligently sought evidence from a source and the evidence was not received or was received less than 5 business days prior to the hearing; or

(v) [The claimant] received a hearing level decision on the record

11

and the Appeals Council reviewed
[that] decision.

20 C.F.R. § 404.970 (2020) (emphasis added).[6] Thus, the new regulation adds <u>two</u> requirements to a claimant's burden to have new evidence considered by the Appeals Council in connection with a request for review: a claimant must show (1) <u>good cause</u> for the failure to submit the evidence in question at least five business days prior to the date of the ALJ's hearing pursuant to 20 C.F.R. § 404.935, and (2) a reasonable <u>probability</u> of a different outcome.[7]

The Commissioner defends the Appeals Council's refusal to consider the FCE on three grounds. First, the Commissioner

---

[6] Evidence submitted to the Appeals Council is:

- "new if it is not part of the [administrative record] as of the date of the [ALJ's] decision";

- "material if it is relevant, i.e., involves or is directly related to issues adjudicated by the ALJ"; and

- "relate[d] to the period on or before the date of the hearing decision if the evidence is dated on or before the date of the hearing decision, or . . . post-dates the hearing decision but is reasonably related to the time period adjudicated in the hearing decision."

<u>Hearings, Appeals, and Litigation Law Manual</u> ("HALLEX"), § I-3-3-6B.2 ("Additional Evidence") (May 1, 2017), available at https://www.ssa.gov/OP_home/hallex/I-03/I-3-3-6.html.

[7] Long-standing Fourth Circuit law defined "material" as a reasonable <u>possibility</u> the new evidence would have changed the outcome of the case. <u>See Meyer v. Astrue</u>, 662 F.3d 700, 704 (4th Cir. 2011); <u>Wilkins v. Secretary, Dep't of Health & Human Servs.</u>, 953 F.2d 93, 96 (4th Cir. 1991). Thus, the new version of Section 404.970 increases a claimant's burden from showing a reasonable <u>possibility</u> to a reasonable <u>probability</u>, and makes the obligation to show a reasonable probability of a different outcome an <u>additional</u> requirement to showing materiality.

contends that the FCE, although dated after the ALJ's decision, does not qualify as "new," because "Plaintiff was represented by counsel and had every opportunity to obtain such documentation *during the relevant period* and prior to her administrative hearing." (Docket Entry 15 a 13 (emphasis supplied by Commissioner) (citing Fagg v. Chater, No. 95-2097, 106 F.3d 390 (table), 1997 WL 39146, at *2 (4th Cir. Feb. 3, 1997) (unpublished), Evangelista v. Secretary of Health & Human Servs., 826 F.2d 136, 140 (1st Cir. 1987), and Spencer v. Commissioner of Soc. Sec. Admin., Civ. No. 16-1735, 2017 WL 1379605, at *11 (D.S.C. Jan. 31, 2017) (unpublished)).) Second, the Commissioner implicitly argues that Plaintiff has failed to make a showing of good cause for the late submission of the FCE. (See id. at 12 (noting that Plaintiff failed to explain, either in her submission to the Appeals Council or in her Memorandum to this Court, "why she did not obtain the FCE before her ALJ hearing" (citing Tr. 365-68)).) Third, the Commissioner maintains that the Court should credit the Appeals Council's finding "that [Plaintiff's] late-submitted evidence [did not] create[] 'a reasonable probability that it would change the outcome of the [ALJ's] decision.'" (Id. at 14 (quoting 20 C.F.R. 404.970(a)(5)).)

a. __New Evidence__

The Commissioner contends that the FCE, although dated after the ALJ's decision, does not qualify as "new," because "[e]vidence is 'new' only if it was 'not in existence *or available to the claimant* at the time of the administrative proceeding'" (Docket Entry 15 at 13 (emphasis supplied by Commissioner) (quoting Sullivan v. Finkelstein, 496 U.S. 617, 626 (1990))), and "Plaintiff was represented by counsel and had every opportunity to obtain such documentation *during the relevant period* and prior to her administrative hearing" (id. (emphasis supplied by Commissioner) (citing Fagg, 1997 WL 39146, at *2, Evangelista, 826 F.2d at 140, and Spencer, 2017 WL 1379605, at *11)). The SSA's updates to the Hearings, Appeals, and Litigation Law Manual ("HALLEX"), enacted to assist the Appeals Council with implementation of the newer versions of Section 404.970, belie the Commissioner's argument. Evidence submitted to the Appeals Council qualifies as "new if it [wa]s not part of the [administrative record] as of the date of the [ALJ's] decision." HALLEX, § I-3-3-6B.2 ("Additional Evidence") (May 1, 2017), available at https://www.ssa.gov/OP_home/hallex/I-03/ I-3-3-6.html. In light of that definition, which does not depend on the "availability" of the evidence, the FCE, created on August 7, 2020 (see Tr. 10-12), clearly qualifies as "new."

14

Thus, this factor would not have provided the Appeals Council with a basis to reject the FCE.

**b.** <u>**Good Cause**</u>

Although the Commissioner did not <u>expressly</u> argue that Plaintiff failed to show good cause for the late submission of the FCE to the Appeals Council, she both adverted to the good cause requirement of Section 404.970(b) (<u>see</u> Docket Entry 15 at 11) and asserted that Plaintiff failed to explain, either in her filings with the Appeals Council or in her Memorandum to this Court, "why she did not obtain the FCE before her ALJ hearing" (<u>id.</u> at 12 (citing Tr. 365-68)). The Court could interpret those two statements together as an implicit argument that Plaintiff failed to make a showing of good cause for the late submission of the FCE.

The Appeals Council, in denying Plaintiff's request for review, remarked as follows:

> [Plaintiff] submitted [the FCE], dated August 7, 2020 (3 pages), and records from Cone Health-Alamance Regional Medical Center, dated July 3, 2020 through August 7, 2020 (43 pages). <u>[The Appeals Council] find[s] this evidence does not show a reasonable probability that it would change the outcome of the [ALJ's] decision. [The Appeals Council] did not exhibit this evidence</u>.

(Tr. 2 (emphasis added).)[8] Thus, the Appeals Council did <u>not</u> expressly find that Plaintiff lacked good cause for failing to

---

[8] Plaintiff does not argue that the remaining 43 pages of the evidence she submitted to the Appeals Council constitute new and material evidence warranting remand. (<u>See</u> Docket Entry 12 at 5-13.)

submit the FCE in a timely manner to the ALJ but rather found that the FCE did not establish a reasonable probability of a different outcome. (See id.)

Courts across the country disagree on whether a federal court on judicial review can consider whether good cause for the late-submitted evidence exists when the Appeals Council did not cite lack of good cause as its basis for rejecting the evidence. Compare, e.g., Sewell v. Commissioner, SSA, No. 20-1409, 2021 WL 3871888, at *5 (10th Cir. Aug. 31, 2021) (unpublished) (holding the plaintiff lacked good cause for late submission even though Appeals Council did not cite any reason for not considering new evidence), cert. denied sub nom., Sewell v. Kijakazi, No. 21-795, 2022 WL 199400 (U.S. Jan. 24, 2022), Y.F.L. v. Kijakazi, No. 20CV4892, 2021 WL 5998442, at *3 (N.D. Cal. Dec. 20, 2021) (unpublished) (considering whether the plaintiff had shown good cause for non-compliance with five-day rule despite fact that "Appeals Council did not cite lack of good cause as a reason for declining [the plaintiff]'s additional evidence"), Zimmerman v. Commissioner of Soc. Sec. Admin., No. CV-19-575, 2021 WL 4129448, at *18–19 (D. Ariz. Sept. 10, 2021) (unpublished) (finding good cause lacking notwithstanding Appeals Council's rejection of new evidence as chronologically irrelevant and immaterial), and Howell v. Saul, No. 2:18CV1323, 2019 WL 3416613, at *11 (D.S.C. July 10, 2019) (unpublished) (deeming good cause wanting notwithstanding Appeals

16

Council's reasonable probability and chronological relevance rationales), recommendation adopted, 2019 WL 3413244 (D.S.C. July 29, 2019) (unpublished), with, e.g., Arndt v. Kijakazi, No. 4:19CV98, 2021 WL 5905646, at *6 (N.D. Ind. Dec. 14, 2021) (unpublished) (noting that "the [Appeals] Council never stated that it was dismissing the evidence for a lack of good cause[ and, t]hus, the [c]ourt will not affirm on those grounds"), Dara L. v. Saul, No. 1:19CV104, 2021 WL 1169653, at *4 n.4 (D. Utah Mar. 26, 2021) (unpublished) ("Where the Appeals Council did not reject the evidence for failure to establish good cause for missing the [five-day] deadline, the court does not reach this issue."), Rankin v. Saul, No. 1:19CV1195, 2020 WL 702749, at *22 (D.S.C. Feb. 12, 2020) (unpublished) (refusing to address Commissioner's good cause argument where Appeals Council found evidence "not new and material"), and Emmons v. Saul, Civ. No. 19-102, 2020 WL 376708, at *5 (D.N.M. Jan. 23, 2020) (unpublished) (declining to consider whether the plaintiff had good cause for failing to submit additional evidence earlier, where Appeals Council rejected additional evidence based on lack of chronological relevance).

Here, Plaintiff made no arguments directed at establishing good cause before the Appeals Council (see Tr. 365-68) or in her brief to this Court (see Docket Entry 12), the Commissioner, at least implicitly, argued lack of good cause in support of her Motion for Judgment on the Pleadings (see Docket Entry 15 at 11-

17

12), and Plaintiff did not submit a Reply and thus did <u>not</u> raise the Appeals Council's "reasonable probability" rationale as a barrier to the Court's consideration of good cause. Moreover, the Appeals Council did not expressly waive the good cause requirement in any of its notices to Plaintiff (<u>see</u> Tr. 2, 8 (advising Plaintiff that she "<u>must</u> show good cause for why [she] missed informing [the SSA] about or submitting [the FCE] earlier" (emphasis added))). <u>See</u> <u>Vahey v. Saul</u>, Civ. No. 18-350, 2019 WL 3763436, at *6 n.6 (D. Haw. Aug. 9 2019) (unpublished) ("As far as the [c]ourt can tell, the Appeals Council did not explicitly waive the good cause requirement as it did for some claimants after the new [version of Section 404.970] went into effect."). Under such circumstances, the Court should follow the reasoning of cases like <u>Sewell</u>, <u>Y.F.L.</u>, <u>Zimmerman</u>, and <u>Howell</u>, and assess whether Plaintiff has shown good cause under Section 404.970 for the untimely submission of the FCE.

Although Plaintiff does not explicitly offer any good-cause argument to this Court (<u>see</u> Docket Entry 12 at 5-13), she did assert that the FCE "was not available prior to the hearing as the assessment was not conducted until after the hearing" (<u>id.</u> at 12). The Court could construe that statement as an argument that the fact that the FCE did not yet exist at the time of the ALJ's decision on June 26, 2020, qualifies as "an unavoidable circumstance" preventing timely submission under Section

18

404.970(b)(3).   Many  courts,  however,  have  rejected  such  an
argument.  <u>See, e.g.</u>, <u>Frasca v. Commissioner of Soc. Sec.</u>, No. CV
20-10194,  2021  WL  4077540,  at  *8  (D.N.J.  Sept.  8,  2021)
(unpublished)  (holding  that  "a  plaintiff  must  go  beyond  stating
that  evidence  is  new  in  order  to  fulfill  the  good  cause
requirement");  <u>Marquez v. Saul</u>,  No.  1:20CV110,  2021  WL  2073510,  at
*5  (D.N.M.  May  24,  2021)  (unpublished)  ("[T]hat  [the  new]  opinions
were  dated  after  the  ALJ's  decision  . . .  on  [its]  face  [does  not]
present  the  sort  of  'unusual,  unexpected,  or  unavoidable
circumstance[s]  beyond  [the  plaintiff's]  control'  that  would
warrant  waiver  of  the  Commissioner's  evidentiary-submission
deadlines.");  <u>Smith v. Berryhill</u>,  No.  CV  1:18-337,  2019  WL  1549036,
at  *21  (D.S.C.  Mar.  6,  2019)  (unpublished)  ("[The  p]laintiff  may
not  use  the  date  of  the  [new  evidence],  which  was  [crea]ted  after
the  hearing  and  days  before  the  ALJ's  decision  was  rendered,  to
automatically  qualify  as  a  good  cause  exception  because  it
undermines the purpose of the rule."), <u>recommendation adopted</u>, 2019
WL  1533171  (D.S.C.  Apr.  9,  2019)  (unpublished);  <u>Scherer  v.
Berryhill</u>,  No.  2:17CV53,  2018  WL  3069205,  at  *3  (N.D.W.  Va.  Apr.  4,
2018)  (unpublished)  ("Nothing  in  the  record  indicates  that  there
was  any  reason  [the  treating  physician]'s  findings  were  not
presented  to  the  ALJ  other  than  the  fact  that  the  assessments  had
not  yet  taken  place  . . . .  This  is  not  one  of  the  circumstances
provided  by  [Section  404.970(b)]  that  would  constitute  good  cause

19

thereby allowing the Appeals Council to consider such evidence."), recommendation adopted, 2018 WL 1960531 (N.D.W. Va. Apr. 26, 2018) (unpublished).

Moreover, Plaintiff's argument glosses over the fact that Plaintiff had ample opportunity, following her application for DIB, to obtain an FCE in a timely manner, if she wished to obtain such an evaluation to buttress her claim, but simply failed to do so. Plaintiff filed her application for DIB on November 12, 2018 (see Tr. 245-56), and first retained her hearing counsel in connection with her request for reconsideration on July 9, 2019 (see Tr. 152-53). On March 16, 2020, the ALJ notified Plaintiff and her counsel that he would hear Plaintiff's case on June 4, 2020 (see Tr. 181-209), which notice expressly cautioned her that, "[i]f [she was] aware of or ha[d] more evidence, such as recent records, reports, or evaluations, [she] must inform [the ALJ] about it or give it to [him] no later than 5 business days before the date of [her] hearing[,]" as well as that, "[i]f [she] d[id] not comply with th[at] requirement, [the ALJ] m[ight] decline to consider the evidence" (Tr. 183 (underscoring added) (bold font omitted)). Plaintiff acknowledged receipt of that notice on March 18, 2020. (See Tr. 210-11.) At the end of the hearing, the ALJ inquired on the record whether Plaintiff's counsel believed "[t]he record[ wa]s complete[,]" to which Plaintiff's counsel responded "[i]t is" (Tr. 107), and neither Plaintiff nor her counsel requested the ALJ to

hold the record open for the submission of additional evidence (see Tr. 107-08). As the above-described facts make clear, Plaintiff had over one and half years to obtain an FCE and submit it to the ALJ in a timely manner, but did not do so. Those facts simply do not demonstrate "unusual, unexpected, or unavoidable circumstance[s] beyond [Plaintiff or her hearing counsel's] control," 20 C.F.R. § 404.970(b)(3).[9]

Finally, Plaintiff makes no argument that she "actively and diligently sought evidence from a source and the evidence was not received" under 20 C.F.R. § 404.970(b)(3)(iv). (See Docket Entry 12.) That consideration also undercuts any claim to good cause in this context. See Marquez, 2021 WL 2073510, at *5 ("[N]othing in the record indicates when [the plaintiff] first requested th[e new] statement from [her treating physician], [or] what efforts she made to ensure that it was timely submitted to the Commissioner before the ALJ's hearing. In other words, there is no indication in the

_____

[9] The SSA's notice of final rule regarding the revisions to Section 404.970 make clear that the five-day rule would apply to neither 1) "evidence of ongoing treatment, which was unavailable at least 5 business days before the hearing," nor 2) additional evidence "a new representative" sought to introduce if the "new representative c[ould] show that a prior representative did not adequately uphold his or her duty to the claimant." Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process, 81 Fed. Reg. 90987-01, 90991 (Dec. 16, 2016) (emphasis added). Here, however, the FCE does not qualify as "evidence of ongoing treatment," id., because it constituted a one-time evaluation by a non-treating physical therapist (see Tr. 10-12). Moreover, Plaintiff's current counsel, who submitted the FCE to the Appeals Council (see Tr. 365-68), failed to argue that, in not procuring an FCE prior to the ALJ's hearing, Plaintiff's hearing counsel "did not adequately uphold . . . her duty to [Plaintiff]," 81 Fed. Reg. at 90991. (See Tr. 363-64, 365-68; see also Docket Entry 12.)

record that the [plaintiff] 'actively and diligently' sought [the treating physician]'s opinions on mental limitations but was nonetheless unable to procure them before the deadline to do so." (internal citations and some quotation marks omitted)); Howell, 2019 WL 3416613, at *11 (D.S.C. July 10, 2019) (unpublished) (finding good cause lacking where the "[p]laintiff [alleg]ed only that he had difficulty in obtaining additional testing and treatment; [and he] did not explain, however, how he was suddenly able to pay for and obtain the electrodiagnostic examination only two (2) months after the ALJ's unfavorable decision").

In sum, Plaintiff has not demonstrated good cause under Section 404.970(b) for her failure to inform the ALJ about or to submit to the ALJ the FCE at least five business days prior to the ALJ's hearing. As such, the Appeals Council did not err in rejecting the FCE.

c.  **Reasonable Probability**

Even assuming, arguendo, that the Appeals Council's "reasonable probability" rationale precludes this Court from finding Plaintiff lacked good cause for the untimely submission of the FCE, Plaintiff still could not prevail, as the Appeals Council did not err in rejecting the FCE because it "d[id] not show a reasonable probability that it would change the outcome of the [ALJ's] decision" (Tr. 2).

22

On August 7, 2020, Physical Therapist Michael Sherk ("PT Sherk") conducted an FCE of Plaintiff's physical functional capacity. (Tr. 10-12.) As a result of the evaluation, PT Sherk concluded that Plaintiff's overall level of ability "[fe]ll[] within the [s]edentary range" (Tr. 10), including the ability to lift and carry seven pounds occasionally (see Tr. 11-12), push 12 pounds and pull 10 pounds occasionally (see Tr. 12), sit frequently (see id.), and stand and walk occasionally (see id.). With regard to postural movements, PT Sherk found that Plaintiff could occasionally climb stairs and could balance on level surfaces, but could never kneel or crouch, and could not balance on uneven surfaces. (See id.)[10] Concerning manipulative functions, PT Sherk opined that Plaintiff remained able to handle, finger, and feel constantly, reach at the waist frequently, and reach below the waist occasionally. (See id.) In addition, PT Sherk observed that Plaintiff had an antalgic gait and made "[n]umerous position changes during standing/seated tolerance testing." (Tr. 10.)

Plaintiff "contends that the FCE is extremely relevant and material to the determination of disability since it is an evaluation based on comprehensive testing to determine [Plaintiff]'s physical abilities; the evaluation also evaluates the

_____

[10] Due to Plaintiff's self-limiting behavior due to reported pain, PT Sherk could not assess Plaintiff's maximum ability to crouch. (See Tr. 12.)

reliability of [her] complaints of pain and the extend [sic] of limitation/disability she may experience secondary to her pain, other related symptoms and her impairments." (Docket Entry 12 at 6-7.) Plaintiff further notes that "the FCE is the only opinion evidence and assessment related to [Plaintiff]'s physical and exertional capacity in the file provided by an examining provider" (id. at 11) and "directly contradicts the RFC conclusions reached by the ALJ regarding [Plaintiff]'s exertional and postural limitations" (id. at 7).

Although the FCE constitutes the only medical opinion evidence submitted by Plaintiff and conflicts with the ALJ's light-exertion RFC (compare Tr. 10-12, with Tr. 64), those facts alone do not compel the conclusion that the FCE raises a reasonable probability of a different outcome in Plaintiff's case. As discussed in more detail below, the ALJ's decision, including his evaluation of the medical opinions of record, discusses substantial evidence relevant to an analysis of the FCE under the factors in 20 C.F.R. § 404.1520c(c), and that evidence defeats Plaintiff's reasonable probability argument.

The applicable regulation explains, under the factor "[c]onsistency," that, "[t]he more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be." 20 C.F.R. § 404.1520c(c)(2). Here, the

24

ALJ's discussion of the medical evidence included the following pertinent findings that lack consistency with the FCE:

- on July 31, 2018, Plaintiff advised her orthopedist, Dr. Wayne Keeling, that she "had a history of lower back pain for over a year, but that it would fluctuate between 'good and bad days'" (Tr. 66 (quoting Tr. 488)), and Dr. Keeling "found that [Plaintiff] exhibited tenderness of the mid lower back with no paresthesia, [] nearly full range of motion[,] . . . negative [] straight leg raise, normal reflexes, normal muscle tone, and normal coordination" (id. (citing Tr. 493, 498));

- on August 22, 2018, Dr. Keeling "found that [Plaintiff]'s thoracic and lumbar spine had normal alignment, but that [her] lumbar spine was tender to palpation; however, she had normal strength and tone" (id. (citing Tr. 506));

- "[d]uring [a] consultation with [] neurosurgeon [Dr. Neelesh C. Nundkumar on September 12, 2018], [Plaintiff] stated that the pain [wa]s worst when she [wa]s laying down, and [that she] actually ha[d] minimal pain when she was up walking" (Tr. 66-67 (citing Tr. 804) (emphasis added)), and Dr. Nundkumar "noted that [medical] imaging d[id] not demonstrate any neural compression, [but] primarily degenerative disc disease" (Tr. 67 (referencing Tr. 810) (stray quotation mark and comma omitted));

- Dr. Nundkumar "recommended injection therapy, and informed [Plaintiff] that she was not a candidate based on the imaging for surgery" (id. (citing Tr. 810));

- "[a] physical examination [on October 17, 2018] at the pain management clinic showed that [Plaintiff]'s muscle tone and strength were intact, but she had restrict[ed] range of motion in her lumbar spine, but unrestricted range of motion in her cervical spine" as well as "a normal gait" (id. (citing Tr. 592)) and, on November 12, 2018, Plaintiff "denied any acute onset joint swelling, redness, loss of range of motion, or weakness" (id. (citing Tr. 604));

25

- Plaintiff's "self-reported levels of pain were _inconsistent_ with clinical observations, and the [pain management] clinic noted . . . that the severity of [her] pain level would be in the _mild to moderate_ category" (_id._ (emphasis added) (citing Tr. 597, 765, 788)).

The ALJ's discussion of the above-described findings makes clear that the FCE would not have changed the outcome of the ALJ's decision.

The ALJ also found "persuasive" (Tr. 68) the state agency medical consultants' opinions that Plaintiff remained capable of medium exertion work, i.e., lifting, carrying, pushing, and pulling up to 50 pounds occasionally and 25 pounds frequently, with additional postural, manipulative, and environmental restrictions (_see_ Tr. 119-21, 138-40). Plaintiff challenges the ALJ's analysis of the state agency medical consultants' opinions on two grounds: she asserts that the ALJ 1) failed to indicate "how persuasive" he found the initial-level consultant's opinions, and 2) "conclude[d] that the opinion of [the reconsideration-level consultant wa]s 'persuasive[,]'" but neither "adopt[ed] a medium RFC or a majority of the other postural or environmental limitations" nor "explain[ed] the basis for the discrepancies between his RFC findings and the 'persuasive' RFC findings of the non examining [s]tate [a]gency [medical] consultants." (Docket Entry 12 at 11 (citing Tr. 68).)

26

The initial- and reconsideration-level consultants issued
<u>identical</u> opinions regarding Plaintiff's RFC (<u>compare</u> Tr. 119-21,
<u>with</u> Tr. 138-40), and the ALJ discussed the initial-level
consultant's opinion, as well as expressly noted the fact that the
reconsideration-level consultant agreed with the initial-level
consultant's opinion (<u>see</u> Tr. 68). Thus, regardless of the ALJ's
use of the singular term "opinion" when assessing persuasiveness,
the ALJ clearly analyzed both opinions together and found them both
persuasive. (Tr. 68.)

Regarding the difference between the consultants' RFC and the
ALJ's RFC, the ALJ found Plaintiff's statements about her symptoms
"not <u>entirely</u> consistent with the medical evidence" (Tr. 65
(emphasis added)) and thus appeared to give Plaintiff's testimony
that she could only lift five pounds (<u>see</u> Tr. 92) <u>some</u> benefit of
the doubt in reducing the consultants' opined RFC from the <u>medium</u>
level of exertion (50 pounds occasionally, 25 pounds frequently
(<u>see</u> Tr. 119, 139)) to the <u>light</u> level (20 pounds occasionally, 10
pounds frequently (<u>see</u> Tr. 64)). That decision by the ALJ actually
favors Plaintiff, <u>see</u> <u>Newsome v. Astrue</u>, Civ. No. 11-1141, 2012 WL
2922717, at *6 (S.D. Ill. July 17, 2012) (unpublished) ("[I]t is
difficult to see how [the] plaintiff was prejudiced by the fact
that the ALJ assessed her with *less* ability to stand/walk than [the
consulting neurologist] did." (emphasis in original)), and does not
provide <u>any</u> support for the notion that the ALJ would have found

27

the sedentary-level FCE opinions persuasive. Moreover, although other minor differences exist between the consultants' RFC and the ALJ's RFC (compare Tr. 119-21, 138-40, with Tr. 64), an ALJ's decision to find an opinion persuasive does not compel him to adopt all of the limitations in that opinion, see Bennett v. Colvin, No. 3:13CV1176, 2015 WL 153950, at *13 (M.D. Tenn. Jan. 12, 2015) (unpublished) (holding that "ALJ who accords 'great weight' to an opinion is not required to adopt that opinion wholesale"); Newsome, 2012 WL 2922717 at *6 (noting that, merely because ALJ "gave 'great weight' to [consultative neurologist's] opinion[,] d[id] not mean [the ALJ] was required to adopt it wholesale").[11]

Two other factors under Section 404.1520c undermine Plaintiff's argument that the FCE raises a reasonable probability of a different outcome. The regulations indicate that the opinion source's relationship with Plaintiff bears on the overall persuasiveness of the opinion. See 20 C.F.R. § 404.1520c(c)(3). In this case, PT Sherk conducted a one-time evaluation to assess Plaintiff for disability. As a result, PT Sherk lacked the

_____

[11] The ALJ's RFC contains lesser restrictions on balancing, stooping, crawling, and exposure to hazards than the consultants' RFC. (Compare Tr. 64, with Tr. 119-21, 138-40). Plaintiff, however, makes no argument that the ALJ's incorporation into the RFC of all of the consultants' limitations would have precluded the three jobs cited by the VE and adopted by the ALJ at step five of the SEP. (See Docket Entry 12.) Nor could Plaintiff have made such an argument, as none of those jobs requires balancing, stooping, crawling, or exposure to hazards in excess of that opined by the consultants. See Dictionary of Occupational Titles, No. 323.687-014 ("Cleaner, Housekeeping"), 1991 WL 672783 (G.P.O. 4th ed. rev. 1991) ("DOT"), DOT, No. 207.685-014 ("Photocopying-Machine Operator"), 1991 WL 671745, and DOT, No. 209.687-026 ("Mail Clerk"), 1991 WL 671813.

longitudinal relationship with Plaintiff and knowledge of her impairments' history that a treating source typically would possess. In that same vein, other than the remarks that Plaintiff "report[ed] falling on stairs in July of 2018 resulting in chronic [complaints of] neck/back pain," and that Plaintiff "[was] being treated at [p]ain [m]anagement by Dr. Naveira" (Tr. 11), PT Sherk did not manifest any further familiarity with the other evidence of record, see 20 C.F.R. § 404.1520c(c)(5).

Consideration of the entirety of the ALJ's decision thus makes clear that, contrary to Plaintiff's arguments, the FCE would not have raised a reasonable probability of a different outcome in Plaintiff's claim. See Moseley v. Berryhill, Civ. No. 6:18-1389, 2019 WL 2107917, at *11-12 (D.S.C. Apr. 22, 2019) (unpublished) (finding Appeals Council did not err in determining that new evidence failed to raise reasonable probability of different outcome, and noting that "elements of [the new psychiatric] opinions [we]re refuted by evidence in the record before the ALJ" and that, "although the ALJ did not have the opportunity to review [the psychiatrist]'s [new] opinions, [the ALJ] relied on substantial evidence in reaching his conclusion that would have been relevant to the analysis of the opinion under 20 C.F.R. §[] 404.1527(c)"), recommendation adopted, 2019 WL 2106181 (D.S.C. May 14, 2019) (unpublished); Pittman v. Berryhill, No. 7:16CV356, 2017 WL 6502852, at *4 (E.D.N.C. Dec. 19, 2017) (unpublished) (finding

29

Appeals Council did not err in deeming FCE insufficient to show reasonable probability of changing outcome of ALJ's decision, where "extreme limitations found in [the] FCE [we]re [] contradicted by [a physician]'s assessment as well as [another physician]'s treatment notes," and the ALJ's crediting of "[t]he state agency physicians, who both found [the plaintiff] could perform work at the light exertional level . . ., similarly cast[ed] doubt on the accuracy of the FCE").

Simply put, Plaintiff has not shown that the Appeals Council erred in declining to consider the FCE because it "d[id] not show a reasonable probability that it would change the outcome of the [ALJ's] decision" (Tr. 2).

## 2. <u>Evaluation of Subjective Symptom Reporting</u>

In Plaintiff's second and final issue on review, she contends that "[t]he ALJ's failure to properly evaluate [Plaintiff]'s pain and other symptoms is harmful error that prevented the ALJ from properly account [sic] for their impact on [Plaintiff]'s RFC." (Docket Entry 12 at 13 (bold font and single-spacing omitted).) In that regard, Plaintiff maintains that "the ALJ's decision is largely void of any explanation of the basis for his negative conclusions regarding the consistency of the evidence and [Plaintiff's] statements regarding the impact of her impairment related symptoms despite [the ALJ's] statement that the 'reasons are explain [sic] in the decision.'" (Id. at 15 (quoting Tr. 65).)

30

Plaintiff additionally asserts that "the evidence the ALJ does appear to rely on to support his negative conclusions is not supported by substantial evidence of record." (Id.) Plaintiff's arguments fail to carry the day.

Social Security Ruling 16-3p, <u>Titles II and XVI: Evaluation of Symptoms in Disability Claims</u>, 2017 WL 5180304, at *5 (Oct. 25, 2017) ("SSR 16-3p") (consistent with the Commissioner's regulations) adopts a two-part test for evaluating a claimant's statements about symptoms. <u>See</u> SSR 16-3p, 2017 WL 5180304, at *3; <u>see also</u> 20 C.F.R. § 404.1529. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." SSR 16-3p, 2017 WL 5180304, at *3. A claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms." <u>Id.</u> Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." <u>Id.</u>

31

Upon satisfaction of part one by the claimant, the analysis proceeds to part two, which requires an assessment of the intensity and persistence of the claimant's symptoms, as well as the extent to which those symptoms affect his or her ability to work.  See id. at *4.  In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record."  Id.  Where relevant, the ALJ will also consider the following factors in assessing the extent of the claimant's symptoms at part two:

1. Daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

32

Id. at *7-8.  The ALJ cannot "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual."  Id. at *5 (emphasis added).

Plaintiff first challenges the ALJ's observations that Plaintiff's "'self-reported levels of pain were inconsistent with clinical observations, and [that] the [pain management] clinic noted in the record that the severity of [Plaintiff]'s pain level would be in the mild to moderate category.'"  (Docket Entry 12 at 15 (quoting Tr. 67) (internal parenthetical citation omitted).)  Although Plaintiff concedes that she "was at times observed to have a reported level of pain that was inconsistent with clinical observations," she points to "other times that her reported levels of pain were consistent with clinic observations."  (Id. (citing Tr. 776, 984, 1008, 1039, 1054) (stray quotation mark and brackets omitted).)  Additionally, Plaintiff asserts that, even "when these 'inconsistencies' were recorded[,] it was observed that [Plaintiff] still exhibited moderate pain" (id. at 15-16 (citing Tr. 597)) and that, "[b]ased on the objective pain scale used by the pain management specialist[,] . . . 'moderate' pain[ ] was described as 'significantly interfering with activities of daily living,'" including "'difficult[y with] feed[ing], bath[ing], get[ting] dressed, get[ting] on and off the toilet[, ] perform[ing] personal

33

hygiene function[s, or] . . . get[ting] in and out of bed or a chair without assistance,'" as well as "'[v]ery distracting'" (id. at 16 (quoting Tr. 597)). According to Plaintiff, "[o]nly the record at [Tr.] 765 notes 'mild' pain; the others [sic] treatment records are generally consistent with moderate pain as described above." (Id.)

The ALJ did not err by stating that the pain management clinic's records noted that Plaintiff's "self-reported levels of pain were inconsistent with clinical observations" and that "the severity of [her] pain level would be in the mild to moderate category." (Tr. 67 (emphasis added) (citing Tr. 597, 765, 788).) Indeed, the three treatment records cited by the ALJ reflect that, despite Plaintiff's subjective complaints of pain at levels of 5/10 (see Tr. 597), 4/10 (see Tr. 765), and 5/10 (see Tr. 788), Dr. Naveira rated Plaintiff's pain at 3/10 ("Moderate") (Tr. 597), 1/10 ("Mild") (Tr. 765), and 2/10 ("Mild to Moderate") (Tr. 788) on those occasions. Furthermore, on the remaining occasions on which Dr. Naveira deemed Plaintiff's reported pain levels inconsistent with his clinical observations, he rated Plaintiff's pain as either 2/10 ("Mild to Moderate") (Tr. 1023) or 3/10 ("Moderate") (Tr. 746, 934, 944). Dr. Naveira did find Plaintiff's self-reported pain levels consistent with clinical observations on multiple occasions (see Tr. 776, 984, 994, 1008, 1039, 1054), but on two of those occasions, Plaintiff reported either 2/10 pain ("Mild to Moderate")

34

(Tr. 994) or 3/10 pain ("Moderate") (Tr. 776), which coheres with the ALJ's observation that Dr. Naveira rated Plaintiff's pain "in the mild to moderate category" (Tr. 67). In the remaining four instances, Plaintiff reported her pain at either 4/10 (see Tr. 984) or 5/10 (see Tr. 1008, 1039, 1054) and, although the clinic did not assign a descriptor such as "Moderate" or "Severe" to those ratings (see Tr. 984, 1008, 1039, 1054), they fall in between the clinic's "Moderate" rating of 3/10 (see, e.g., Tr. 934) and its description of pain beginning at 6/10 as "severely limiting[ and] requiring emergency care not usually available at an outpatient pain management facility" (id. (emphasis added)). As the ALJ accurately described Dr. Naveira's pain level observations in the pain management records the ALJ specifically cited (see Tr. 67 (citing Tr. 597, 765, 788)), and none of the pain management records not explicitly discussed by the ALJ conclusively establish pain at the "severe" level (as defined by the clinic), Plaintiff has not shown that the ALJ erred by noting that Dr. Naveira rated Plaintiff's pain "in the mild to moderate category" (Tr. 67).

Plaintiff further maintains that her "inconsistent reporting [of pain levels] is secondary to her lack of understanding of the different pain scale utilized by her pain management provider" (Docket Entry 12 at 16 (citing Tr. 788)), and faults the ALJ for "fail[ing] to address the differing pain scale and the definition of moderate pain supplied by the treatment provider" (id.).

35

Plaintiff also argues that the ALJ's finding regarding the inconsistency of Plaintiff's pain complaints with the record conflicts with "the pain management provider[']s notes that suggest that additional treatment interventions, such as a radiofrequency ablation, are necessary because '[Plaintiff] has failed to respond to conservative therapies and more invasive therapies' on a sustained basis." (Id. at 16-17 (quoting Tr. 766) (internal parenthetical citation omitted).)

Plaintiff's repeated tendency to over-report her subjective pain level (see Tr. 597, 746, 765, 788, 934, 944, 1023) actually supports the ALJ's finding that Plaintiff's statements about the intensity and limiting effects of her pain "[we]re not entirely consistent with the medical evidence" (Tr. 65). Dr. Naveira's records reflect that he consistently instructed Plaintiff about the clinic's pain scale and advised her that her self-reported pain levels did not adhere to that scale. (See Tr. 765, 788, 944.) Thus, Plaintiff's continued over-reporting of her pain level, despite Dr. Naveira's repeated instructions, suggests that those inflated pain ratings resulted from something other than mere misunderstanding of the clinic's pain scale. Moreover, given that the ALJ found Plaintiff's degenerative disc disease a "severe" impairment at step two of the SEP (Tr. 61) and included significant exertional, postural, manipulative, and environmental limitations in the RFC (see Tr. 64), Plaintiff has not shown how the ALJ's

36

express discussion of the pain clinic's definition of moderate pain (see, e.g., Tr. 597 (describing "Moderate" pain as involving significant interference with daily activities and difficulty with self-care activities)) would result in a more favorable outcome in her claim. Similarly, although Dr. Naveira recommended Plaintiff undergo radiofrequency ablation to obtain "longer relief" of her lower back pain than she obtained from lumbar facet block injections (Tr. 767 (emphasis added)), that recommendation does not negate the fact that Plaintiff consistently reported substantial relief from her medications and injections (see Tr. 598, 777, 945, 995, 1009, 1024, 1056 (>50% benefit, "medication allows her to accomplish basic [daily activities]" and "allow[s] for [an] increase in [daily] activities"); see also Tr. 747 (75% relief after injection lasting one week with gradual symptom return), 766 (75% relief after injection), 1023 ("Meloxicam is very effective")).

Plaintiff next faults the ALJ for "cit[ing] to records taken out of context," in that he cited to a "review of symptoms" in a pain management record dated November 12, 2018 (Docket Entry 12 at 17 (citing Tr. 67 (in turn citing Tr. 604))), but ignored "objective findings of decreased range of motion of the lumbar spine, pain with movement, tenderness to palpation, bilateral facet joint pain, [sacroiliac] and hip arthralgia and pain as well as limited ambulation, antalgic gait and difficulty standing up

37

straight secondary to pain" (id. (citing Tr. 607)). By way of further example, Plaintiff contends that "the ALJ fail[ed] to explain how some of the findings [the ALJ] appear[ed] to cite to, such as 'normal range of motion of the thoracic spine' or lack of evidence of 'acute onset of joint swelling, redness'" hold any relevance to Plaintiff's allegations regarding her cervical and lumbar degenerative disc disease symptoms. (Id. (citing Tr. 68).)

Plaintiff's argument ignores the ALJ's express discussion of the objective findings from the pain management record in question:

> Physical examination of [Plaintiff]'s cervical and thoracic spine showed that she had unrestricted range of motion, and normal muscle strength and tone [(Tr. 606]. [She] had decreased range of motion [of] her lumbar spine, although her muscle tone and strength were intact and stable [(Tr. 607)].

(Tr. 67.) Although the ALJ did not discuss all of the findings from that examination, he labored under no obligation to do so, see Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) ("'[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision.'" (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005))), and he clearly recognized that Plaintiff experienced lower back pain (see Tr. 66 ("The medical record indicates that [Plaintiff] has chronic back pain.")). As for the findings of "limited ambulation, antalgic gait and difficulty standing up straight secondary to pain" (Docket Entry 12 at 17 (citing Tr. 607)), those findings appeared once in

38

the pain management records at the <u>outset</u> of Plaintiff's treatment (<u>see</u> Tr. 607) and did <u>not</u> recur in any of the other pain management treatment notes (<u>see</u> Tr. 592, 752, 771, 784, 796, 940, 955-56, 990, 1002-03, 1014, 1031, 1046), with the exception of a notation of "[a]ntalgic" posture (but "[u]nassisted" and "[r]elatively normal" gait) on March 2, 2020 (Tr. 1063). The ALJ's omission from his discussion of such isolated findings does not render his decision unsupported by substantial evidence.

Although Plaintiff faults the ALJ for "cit[ing] to records taken out of context" (Docket Entry 12 at 17), Plaintiff's contentions regarding the ALJ's alleged reliance on "'normal range of motion of the thoracic spine'" and the "lack of evidence of 'acute onset of joint swelling, redness'" (<u>id.</u> (quoting Tr. 68)) fail to place those remarks in their proper context. When providing his rationale for finding the state agency medical consultants' opinions persuasive, the ALJ reasoned as follows:

> The [initial-level] state agency consultant supported her [sic] opinion by citing to evidence in the medical record and noting that[,] although [Plaintiff] ha[d] a history of chronic pain, medical imaging showed mild degenerative changes in her cervical spine, [and] she had unrestricted range of motion in her lower extremity[;] although she ha[d] multiple osteophytes and joint space narrowing in her shoulder, [she wa]s able to complete activities of daily living such as taking care of household chores[ and] driving, and [had] <u>unrestricted range of motion in her thoracic spine</u>.

(Tr. 68 (emphasis added) (referencing Tr. 122).)[12]  As the above-
quoted language makes clear, the ALJ merely pointed out the
<u>consultant</u>'s discussion of Plaintiff's normal thoracic range of
motion at Dr. Naveira's examination on November 12, 2018.  (<u>Id.</u>;
<u>see also</u> Tr. 606-07 (also reflecting normal cervical, upper
extremity, and lower extremity range of motion).)  As previously
discussed, the ALJ expressly recognized that Dr. Naveira found
Plaintiff's lumbar spine range of motion reduced on that date.
(<u>See</u> Tr. 67 (citing Tr. 607).)

Plaintiff's assertion regarding the ALJ's reference to the
"lack of evidence of 'acute onset of joint swelling, redness'"
(Docket Entry 12 at 17 (quoting Tr. 68)) fares no better.  The ALJ
accurately observed that, on November 12, 2018, Plaintiff "denied
any acute onset joint swelling, redness, <u>loss of range of motion,</u>
<u>or weakness</u>" (Tr. 68 (emphasis added) (citing Tr. 604)) which,

_____

[12] The state agency medical consultant's reference to "multiple osteophytes
and joint space narrowing in [Plaintiff's] shoulder" (Tr. 122) refers to medical
records belonging to an individual other than Plaintiff mistakenly included in
the record at Exhibit 11, pages 9 through 13 (<u>see</u> Tr. 712-16).  The ALJ also
cited that evidence as if it pertained to Plaintiff.  (<u>See</u> Tr. 67 (noting that
Plaintiff "complained of bilateral shoulder pain, indicating that the pain
bec[a]me[] worse with activity such as reaching above shoulder level" (citing Tr.
712), that "[a]n ultrasound of [Plaintiff]'s shoulder found severe degenerative
disease, multiple osteophytes and joint space narrowing" (citing Tr. 713), and
that Plaintiff "was provided with an injection, which helped for one week before
the pain returned" (citing Tr. 715); <u>see also</u> Tr. 61 (finding "degenerative joint
disease of the bilateral shoulders" a severe impairment at step two of SEP).)
Neither party alerted the Court to that error.  (<u>See</u> Docket Entries 12, 15.)  The
ALJ's reliance on those misplaced records did not prejudice Plaintiff, however,
because the ALJ considered an <u>additional</u> impairment that Plaintiff did not
actually have in fashioning Plaintiff's RFC.  (<u>See</u> Tr. 64 (including restriction
to frequent bilateral overhead reaching in RFC), 68 (crediting state agency
medical consultants' limitation to frequent bilateral overhead reaching).)

40

given Plaintiff's complaints of back pain, neck pain, and lower extremity pain (see Tr. 597-98), clearly hold relevance.

Plaintiff lastly "contends that the ALJ [] failed to evaluate the extent to which [Plaintiff] performed [] daily activities by ignoring her qualifying statements regarding these activities and other evidence in the record that was consistent with her allegations." (Docket Entry 12 at 17 (quoting Woods v Berryhill, 888 F.3d 686, 694 (4th Cir. 2018), for proposition that "'an ALJ may not consider the type of activities a claimant can perform without also consider[ing] the extent to which she can perform them'").) In that regard, Plaintiff notes that she "testified that house cleaning activities, like vacuuming or dusting, ma[d]e her pain worse[,] . . . [and] that she could 'usually make it through about 25 minutes of shopping before [she would] have to go to the car' if she had a shopping cart to lean over[, but] without the shopping cart she could walk 'maybe [about] 10 minutes.'" (Id. at 18 (quoting Tr. 90) (internal parenthetical citation omitted).) Plaintiff additionally highlights her testimony describing a typical day as follows:

> "[I ]would get up, get a bite to eat, take [my] medicines and then go to the recliner for about an hour. [I] would try to fix one meal a day, eat and go back to the recliner. If it gets too bad I'll go lay down for a while. I'll get back up, I'll try to clean the kitchen up and then I'm just basically back in the recliner until time to go to bed."

41

(Id. (purporting to directly quote, but actually paraphrasing Tr. 94-95).)  Plaintiff further notes that "[h]er boyfriend did all the yardwork, [and] helped with cooking and cleaning, driving her places[, and] . . . checking to make sure she paid her bills and managed her finances correctly."  (Id. at 19 (citing Tr. 95) (internal parenthetical citation omitted).)  According to Plaintiff, "it is unclear how the activities the ALJ cites, even without [Plaintiff's] qualifying statements, support the ALJ's negative conclusions regarding the consistency of [Plaintiff's] allegations with the evidence of record."  (Id.)  Those contentions fall short for two reasons.

To begin, the ALJ's mention of Plaintiff's daily activities occurred within the context of his evaluation of the state agency medical consultants' opinions.  (See Tr. 68.)  In that regard, the ALJ noted that he found the initial-level state agency consultant's opinion "persuasive" because the "consultant supported her [sic] opinion by citing to evidence in the medical record and noting that [Plaintiff wa]s able to complete activities of daily living such as taking care of household chores[ and] driving."  (Id.)  Thus, the ALJ did not directly rely upon Plaintiff's daily activities to discount her subjective symptom reporting.  Moreover, to the extent Plaintiff's daily activities factored into the ALJ's evaluation of Plaintiff's subjective complaints, the ALJ clearly did not rely solely on Plaintiff's daily activities, but rather cited them as

42

one part of his overall analysis. (See Tr. 64-69 (reflecting ALJ's consideration of objective medical evidence, types and effectiveness of Plaintiff's treatment, and opinion evidence).)

More significantly, however, the ALJ did not err by crediting the consultant's discussion of Plaintiff's daily activities. The record contains competing descriptions of Plaintiff's ability to engage in daily activities (compare Tr. 122 (initial-level state agency medical consultant's report that: "[Plaintiff] states she does drive. [She] lives alone. She does have a boyfriend that will frequently stay over at her home. [She] is able to take care her [household] chores and cooking. [She] prepares mainly microwavable meals, sandwiches, etc. . . . [She d]oes not use any [hand-held assistive devices]. [She] uses a push cart when grocery shopping." (emphasis added)), 310-17 (Function Report completed by Plaintiff's boyfriend reflecting that Plaintiff drives, prepares meals daily if he does not cook for her, does laundry once per week, and does a "little cleaning" without help), 533 (Plaintiff's listing of "[s]hopping" as "[l]eisure [a]ctivity" in psychological assessment), and 598, 777, 945, 995, 1009, 1024, 1056 (Plaintiff's statements to Dr. Naveira that ("medication allows her to accomplish basic [daily activities]" and "allow[s] for [an] increase in [daily] activities"), with Tr. 90, 94-95, 97 (Plaintiff's testimony describing limitations on meal preparation, shopping, household chores, driving, and managing her finances),

43

326-27, 336 (Plaintiff's remarks on Disability Reports alleging difficulty with household tasks), 845 (Plaintiff's report to consultative psychological examiner Dr. Julia Brannon that Plaintiff's boyfriend helps her cook and clean, and that dishes sit in the sink for two to three days before she washes them)). Plaintiff has not provided the Court with any basis to disturb the ALJ's crediting of the consultant's reliance on statements reflecting a greater ability to engage in such activities. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) ("Ultimately, it is the duty of the [ALJ] reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence."). Moreover, Plaintiff's ability to engage in such activities, even on a somewhat limited basis, provides some support, along with the medical and opinion evidence discussed by the ALJ, for the ALJ's conclusion that Plaintiff's impairments did not prevent her from performing a limited range of light work (see Tr. 64).

In short, Plaintiff's second and final assignment of error fails as a matter of law.

### III. **CONCLUSION**

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Summary Judgment (Docket Entry 11) be denied, that Defendant's

44

Motion for Judgment on the Pleadings (Docket Entry 14) be granted, and that this action be dismissed with prejudice.

                                          /s/ L. Patrick Auld
                                       **L. Patrick Auld**
                              **United States Magistrate Judge**

April 4, 2022